| 65 | 301 |
| 68 | 722 |

WILLIAM GREEN, DEFENDANT IN ERROR, v. THE ERIE RAILROAD COMPANY, PLAINTIFF IN ERROR.

Argued June 29, 1900—Decided November 19, 1900.

1. The growing rapidity of train motion, not prohibited by law, on the steam railroads and over their highway crossings, tends to create new and greater risks to the highway traveler and trains at such crossings, and demands the exercise of a degree of care in avoiding collisions, both by persons crossing and those in charge of the trains, in direct proportion to the added risks.

2. G., while standing up on his open wagon loaded with stone, to which his horses were attached, in his effort to drive ahead of a westbound train which he saw moving toward him about three hundred feet away, attempted to cross the defendant's double tracks at a highway crossing, and was struck and injured by an eastbound express train, moving toward him at a high rate of speed from the opposite direction, but which an intervening hill prevented him, after reaching the tracks, from seeing, until it was about four hundred feet from him. *Held,* that he was clearly guilty of contributory negligence productive of his injury, which proper caution would have prevented, to be deduced from the circumstances then existing, and more fully detailed in the following opinion.

On error to the Supreme Court. This cause was tried at the October Term, 1897, of the Passaic Circuit before Mr. Justice Dixon and a jury, and a verdict rendered for the plaintiff for $700.

For the plaintiff in error, *Eugene Emley.*

For the defendant in error, *William B. Gourley.*

The opinion of the court was delivered by

VREDENBURGH, J.   The exceptions sealed to the rulings of the trial justice in this cause, denying the defendant's several motions—to nonsuit and to direct a verdict for defendant—require on this writ of error a review by this court of the case as presented to the trial court.

We think that the plaintiff's conduct in attempting to drive across the railroad tracks, under the admitted conditions then existing, should be held to have been a negligent act so clearly contributive to his injury as to bar him from recovery of damages.   The case was carefully tried and is one of public importance in the large field of constantly occurring railroad crossing accidents.   Instead of relaxing in the least degree the legal rules of caution required to be observed by those attempting to drive vehicles, however drawn or moved, over such crossings, it seems to me that present conditions demand even a more strict adherence to those rules.   The growing rapidity of train motion, and the increased use of the highways for locomotion thereon in its great variety of forms, tend to create new and greater risks to the traveler at those crossings, and demand the exercise of care in avoiding accidents, both by persons crossing as well as by those in charge of the trains, in direct proportion to such added risks.   This general idea was recognized by the able and experienced judge who tried this case below, when he said, in his charge to the jury, that "that which is reasonable care rests with the danger; the greater the danger, the greater the care."   While the trains on the steam railroads over their lines and highway crossings have, lawfully, the exclusive right of way, and no legislative prohibition forbids such increase of train speed, it must be assumed by the courts that the public encourages, even if it does not demand, such speed.   The permanent laying down and use of heavy steel rails for the support of immense steam engines of the most powerful type, by means of which cars thereon are oftentimes propelled faster than a mile a minute, has certainly increased the danger of collisions at these crossings.   These important changes, involving consequent increase of risks, must, in the interests of life and

property, equally on both highway and railroad, be recognized and met by the decisions of the courts.

The material facts upon which the plaintiff's verdict rests are the following: About nine o'clock in the morning of February 10th, 1897, the Erie nine o'clock express train, running at a high rate of speed, on its usual scheduled time, at the Summer street crossing, in Passaic, on its way over its eastbound track to Jersey City, struck the plaintiff's loaded open wagon, upon which he was then standing and driving his horses, and produced the injury which is the subject of this suit. At this point the railroad had two tracks—the westbound was the first he had to cross before reaching the eastbound, and after crossing the first, or most westerly rail of the first track, he had to drive thirteen feet further on in order to reach the first rail of the eastbound track, upon which the accident occurred. The most westerly rail of the westbound track was distant thirty-eight and one-half feet, measuring from the corner of a building or shop standing on the corner of Summer street. After passing this obstruction, it is admitted that he had a clear view of the track in the direction the train was coming for a distance of not less than a quarter of a mile, notwithstanding the fact that there was a curve of the track there in the line of his view. It cannot be the subject of dispute, under the evidence, that the train which, in fact, so quickly overtook him must have been, at the time he drove past this building, running somewhere within that quarter of a mile, nor can it be doubted, from his own testimony, that except the first look he says he gave at the corner of the building, he did not look again after passing beyond the corner of that building and before he himself (not his horses) actually came between the two tracks. He swears that at that corner he looked and saw no train, and his credibility is not here open to discussion. But other parts of his evidence make it apparent, as, indeed, the disastrous sequel has demonstrated, that at the time he says he so looked the train was, in fact, within range of his eyesight, and that if he failed to see it, he must have thrown a very careless glance in its direction. Every reasonable calculation based upon the

evidence of the speed of that train relative to that of the plaintiff's walking horses, as well as the carefully-taken photographs in evidence, tend to show that the train, at that time, must have been not more than eight hundred feet away from the place of collision. The following extracts from his cross-examination are important to be stated in this connection:

"*Q.* When you came towards the railroad through Summer street, and cleared the shop, you say you looked?

"*A.* Yes.

"*Q.* How far could you see at that point?

"*A.* About a quarter of a mile.

"*Q.* Don't you know that where the train comes into view from Clifton, around that slight curve, is more than half a mile from Summer street?

"*A.* I know that its not more than half a mile.

"*Q.* How do you know that?

"*A.* I walked it this morning.

"*Q.* How long did it take you?

"*A.* About four minutes.

"*Q.* How near to the railroad must a man approach on Summer street before the hill will interfere with his view?

"*A. About between the two tracks.*

"*Q.* Where would you be when this hill would interfere with your vision?

"*A. Between the two tracks.*

"*Q.* You got fairly on the track before you took the second observation?

"*A.* Yes, sir.

"*Q.* And then did you look the second time?

"*A.* Yes, sir; it struck me right away."

Elsewhere, also, he testified as follows:

"When I got the horses on the down (east) track, I looked around again and the train had run right down on top of me.

"*Q.* Where were you, upon the track, when you saw the locomotive?

"*A.* The horses were right on the down track; the front feet of the horses."

It is thus entirely clear, from the plaintiff's own testimony, that he made no other effort to ascertain the place of the coming train, until it was "on top" of him, except the one look when at the building and before he drove the thirty-eight feet toward the tracks. He had a time-table of the road in his possession, and from this, as well as from his own experience as a teamster in that locality, he had reason to believe that that express train was due there about that time. He had no reason to think it had yet passed, and it is nowhere in the case claimed that he supposed it had. This crossing was known to him as a very dangerous one, or, to adopt the language of his own declaration, as "one of extraordinary danger," for the reason given by him in his testimony, that, after entering upon the tracks, a hill hid the eastbound track for a distance of about four hundred feet from his view. He was encumbered with a load of stone, which common experience should have taught him would make quick escape from a fast-moving train impossible. Yet he admits that he did not look at all for the train after he left that corner until looking became almost hopeless and the train was "upon him." This was certainly a failure "to exercise the highest practicable degree of care in avoiding the danger," and was clearly contributory negligence as defined by this court in the Leary case (cited hereinafter), unless some circumstance intervened to excuse such failure. The circumstance relied on as such excuse appears in the following extracts from his testimony, viz.:

"When I got to that corner, I looked toward Clifton and saw the train (the westbound), but I saw I had time to go ahead of it and drove on, and when I got the horses on the down track I looked around again, and this train (the eastbound) had run right down on top of me. * * * I saw I had time to pass ahead (the westbound) and I drove on; before I got across this train (the eastbound) came from behind the hill."

He thus admits that when he was at the corner of Summer street, and at least thirty-eight feet away from the nearest track, he voluntarily and deliberately drove out of a place of

safety and into a place defined by himself as "one of extra-
ordinary danger." Instead of waiting at the corner where
he was when he saw a train moving from the opposite direc-
tion toward him (it is said in the evidence about two hundred
and fifty to three hundred feet away) for it to pass, he chose
to take the double risk of getting ahead of both trains, when,
if he had waited but for a few moments, he would have cer-
tainly avoided not only the approaching train he saw, but
also the other approaching train, which he could not, after
advancing further to the tracks, see, because the train that
struck him reached the crossing first. This clearly appears
by the evidence of the engineer of the westbound train, and,
indeed, is a necessary deduction from the plaintiff's testi-
mony, as well as from the rate of his progress as compared
with that of the respective trains and the measurements of
distances above given. The folly of his driving on the west-
bound track, where he could not stop without certain destruc-
tion, and from which he could not escape except by either
retreating, hampered by a loaded wagon, or by further ad-
vancing upon the next track, where he had reason to believe
the nine o'clock express might make the danger still more
imminent, needs no further comment. If it be claimed that
his sight of the approaching westbound train produced in his
mind a state of perplexity, it is impossible to yield to such
claim, because he was then in no kind of danger, but even so,
he had the remedy in his own hands. After he saw the west-
bound train he had ample opportunity to halt and avoid all
danger—he needed only to stop or check his walking horses.
He was in a place of perfect security, where he could have
remained until the danger was over. Under the conditions
above presented, the plaintiff's doubt or perplexity, while he
occupied a place of safety, should have been resolved by him
in favor of the safer course. He cannot be permitted to offer
in excuse of his negligent act in failing to look more care-
fully while his view was unobstructed for the coming of the
train (which was then due, but which he, after reaching the
place of danger, knew he could *not* see) the still more negli-
gent act of driving in front of the train which he did see, and

if his load of stone had thrown the colliding train from the track, resulting in loss of life therein or destruction of property, a serious question of his own responsibility therefor might have been presented. But, certainly, he has no standing in court, as a plaintiff, to force others to pay for his hazardous experiment that day.

The following decisions of this court, founded upon somewhat similar circumstances, afford support for these conclusions, viz.: *Railroad Co.* v. *Righter,* 13 *Vroom* 180; *Merkle* v. *Railroad Co.,* 20 *Id.* 473; *Railroad Co.* v. *Leary,* 27 *Id.* 705; *Central Railroad Co.* v. *Smalley,* 32 *Id.* 277; *Conkling* v. *Railroad Co.,* 34 *Id.* 338; *Keyley* v. *Central Railroad Co.,* 35 *Id.* 355; *Dotty* v. *Atlantic City Railroad Co.,* *Id.* 710.

The judgment below should be reversed.

*For affirmance*—THE CHIEF JUSTICE, FORT, BOGERT.	3.

*For reversal*—VAN SYCKEL, GARRISON, COLLINS, HENDRICKSON, ADAMS, VREDENBURGH, VOORHEES.	7.